# UNITED STATES DISTRICT COURT
## THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**KIMBERLY HORNE,**
**PLAINTIFF**

**CASE NO. 1:07-cv-1032-SJD-TSH**
**(DLOTT, C. J.)**
**(HOGAN, M. J.)**

VS.

**COMMISSIONER OF**
**SOCIAL SECURITY,**
**DEFENDANT**

## REPORT AND RECOMMENDATION

Plaintiff filed her application for disability insurance benefits (DIB) in August, 2004. She

alleged an onset date of October 6, 2003. Plaintiff's application was denied, both initially and

upon reconsideration. Plaintiff then requested and obtained a hearing before an Administrative

Law Judge (ALJ) at Huntington, West Virginia on August 17, 2006. At the hearing, Plaintiff,

who was represented by counsel, testified as did Vocational Expert (VE), William L. Tanzey.

Following an unfavorable decision in January, 2007, Plaintiff processed an appeal to the Appeals

Council, which refused review in November, 2007. Plaintiff then filed her Complaint with this

Court in December, 2007, and sought judicial review of the final order of the Defendant

Commissioner denying her benefits.

## STATEMENTS OF ERROR

Plaintiff asserts that the ALJ erred in several respects. She first argues that the ALJ's

hypothetical question to the VE was flawed because the ALJ indicated Plaintiff could stand for

four hours and sit for six hours, yet the ALJ's own RFC assessment indicates Plaintiff could sit

for only four hours. Plaintiff argues that the ALJ's hypothetical question to the VE was improper

because it did not limit plaintiff to 4 hours of sitting or standing as set forth in the consultive examination upon which the ALJ relied on to deny benefits. Next, Plaintiff claims that the ALJ should have found at least a closed period of disability. Plaintiff also argues that the ALJ erred in his evaluation of her alleged panic disorder. Plaintiff next claims that the ALJ erred because he failed to find that Plaintiff's impairments met or medically equaled the Listing for mental retardation. Finally, Plaintiff argues that the ALJ erred in evaluating her credibility and subjective reports of pain.

## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified that she completed the ninth grade and dropped out of school to get married. She obtained her GED at age 19, and passed the test the first time. It took her four attempts to pass the written portion of her driving test when she was 29 years old. She also testified to repeating the third grade.

Plaintiff last worked as a housekeeper at a hospital and stopped working after she fell over an IV pole. She has not been back to work since. She also previously worked in a restaurant.

Plaintiff had cervical spine fusion in September 2004. Plaintiff testified that she continued to have pain following the surgery. She stated that it feels like something crawling, it burns and it radiates down her arms into the fingers. Plaintiff also testified to weekly headaches. She took Ibuprofen for relief. She also testified how her pain impacts her ability to concentrate and pay attention. If her pain is unbearable she has to lie down during the day. She cannot hold her neck in one position for long or else it will lock up and it is hard to extend her neck as it

2

causes pain and dizziness. She cannot fully rotate her neck because her arms go numb. She has trouble sleeping due to neck pain and wakes several times a night. Plaintiff continued to smoke one pack of cigarettes per day for the past 20 years.

She further testified that she was hospitalized in December 2004 for anxiety and panic attacks as she felt like she was going crazy and having a heart attack. When she has an attack she experiences rapid heartbeat, diarrhea, loss of bladder control, cold sweats, breathing problems, chest pain and pain from head to toe. She has been prescribed Klonopin and Lexapro. (Tr. 307-28).

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The ALJ's hypothetical question to the VE assumed an individual who has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently; stand for four hours and for no more than one hour at a time; sit for six hours and for no more than two hours at a time; occasionally push and pull with her arms and legs; no sustained or frequent overhead work; no use of hand held vibrating tools; no climbing hills, high ladders, or work on slopes, uneven terrain, or work at unprotected heights; occasionally climb stairs, steps, and ramps, bend, stoop, balance, crouch or kneel but never engage in prolonged crouching, squatting, or crawling; no work near heavy moving machinery or exposure to excessive core vibrations; no operation of mobile equipment or otherwise be exposed to jarring, jolts, or jostling; no operation of foot pedals; no excessive air pollutants, temperature extremes, or coldness; no damp humid conditions. The hypothetical individual could understand, remember, and follow one- and two-step directions; had fair ability to relate to bosses, co-workers, and the general public; had mild to

3

moderate impairment in her ability to tolerate stress of day-to-day employment. Lastly, the hypothetical individual was mildly impaired in sustaining concentration and attention. The VE responded that an individual of Plaintiff's age, education, and work history with those limitations could perform such light jobs as price marker (117,000 nation, 9,000 region); hand packaging (120,000 nation, 6,000 region); and grading and sorting jobs (70,000 nation, 5,900 region). (Tr. 332). The VE also identified sedentary jobs the Plaintiff could perform such as bench assembler (75,000 nation, 5,000 region); inspector (80,000 nation, 6,000 region); and shipper (85,000 nation, 4,000 region). (Tr. 332). The VE testified that his testimony was consistent with the information contained in the *Dictionary of Occupational Titles.* (Tr. 329-35).

## MEDICAL OPINIONS

In October, 2003, Plaintiff presented to the ER for neck and shoulder pain occurring after she bent over at work. Examination revealed tenderness on palpation over the left trapezius muscle and tenderness medial to the left scapula. Clavicle and AC joint were non-tender. She had good range of motion of the shoulder, elbow and wrist. X-rays were negative and she was assessed with cervical strain. (Tr. 92-94).

In December, 2003, Plaintiff saw Jerrel Boyer, D.O. for evaluation of a cervical disk herniation. Her primary complaint was pain in the upper thoracic spine. At that time she had not had any physical therapy, chiropractic treatment or injections. Dr. Boyer noted Plaintiff may eventually require surgery for her herniation. He prescribed physical therapy. (Tr. 164-65).

In February, 2004, Plaintiff saw Dr .Boyer, D.O. for follow-up of her upper thoracic spine pain. Her symptoms radiated to the left upper arm and left forearm. Her neck pain was

4

greater than her arm symptoms and she characterized it as sharp. She had been having some episodes of ambulatory dysfunction. She occasionally stumbled into walls. Physical examination was essentially normal. Dr. Boyer was concerned that she was developing myelopathic symptoms as well as objective signs of myelopathy on her examination. He noted her disc herniations were rather small. (Tr. 163).

A cervical spine MRI taken March, 2004 showed disc extrusion at C5-6, foraminal spondylosis secondary to degenerative osteoarthritis. (Tr. 96-97, 100, 158-59). Plaintiff told Dr. Boyer that she tried to return to work but was unsuccessful because of significant worsening of her symptoms. She complained of significant neck and arm pain. She still had unsteady gait. Dr. Boyer noted even though her MRI was not impressive, she clearly had an examination consistent with myelopathy. Dr. Boyer recommended surgical intervention and discussed with Plaintiff that the surgery is primarily preventive in nature and no guarantees were given with regard to resolution for symptoms. (Tr. 157) .

In April, 2004, Plaintiff presented to the ER again reporting neck pain which was not relieved by her normal muscle relaxant, Methocarbamol. She had no complaints of any loss of sensation or function in the upper extremities, although she did complain of numbness in the first digit of the left hand and weak grip strength. Examination revealed some tenderness to the paraspinal musculature and limited range of motion due to pain. Plaintiff was given Vicodin and released. (Tr. 98-99).

In May, 2004, T. Robert Love, M.D., an orthopedic surgeon, provided an independent medical evaluation of Plaintiff. Plaintiff reported pain in her neck and discomfort down the left arm with extensive tingling in the 2nd-4th fingers. Dr. Love noted treatment to date had been

5

conservative. She had reduced range of motion in her neck, cervical tenderness at C5-6 and C6-

7. Lateral bending to the right reproduced pain in the left arm. Upper extremities revealed

symmetrical reflexes. Dr. Love recommended C5-6 and C6-7 fusion surgery. (Tr. 100).

In May, 2004, Plaintiff was given a ten pound lifting restriction, no work requiring use

of arms above shoulder level, and no work near hazards from the Workers' Compensation Clinic.

(Tr. 250).

In July 2004, Lumbar and thoracic spine x-rays revealed only mild degenerative changes.

(Tr. 247-48). Dr. Boyer noted that, despite Plaintiff's pain complaints, physical examination

was essentially normal. (Tr. 155). Dr. Boyer noted,

> [that Plaintiff's] surgery approval was only for the C5/6 level,
> stating this is the only one that is work-related. However, her
> initial MRI shortly after the accident showed a C6/7 disc herniation
> and this is actually the one more likely to be causing her current set
> of symptoms, however, both can contribute to myelopathy. I
> certainly would not undertake surgical intervention without treating
> the C6/7 level as well, and I do feel that they are both work-related
> injuries. To have any reasonable chance of preventing her
> progressive myelopathy, these would both need to be treated. She
> does have evidence of myelopathy on today's examination as well,
> although mild. Her imaging studies are mild, but do show
> pathology referable to her symptoms. I have recommended
> surgical intervention at the C5/6 and C6/7 levels. She understands
> the usual risks and complications, including but not limited to
> bleeding, infection, injury to the spinal cord or nerves, swallowing
> difficulty, hoarseness, failure of fusion or of instrumentation and
> permanent pain and numbness at her graft harvest site. She also
> understands the nature of the operation is primarily to prevent
> ongoing myelopathy and that she may experience no improvement
> in her symptoms whatsoever. Her left arm pain may improve, but I
> do not expect her neck pain to improve. This was discussed with
> the patient. She was also advised to quit her smoking because of
> its detrimental effect on bone fusion.

6

(Tr. 156).

In August, 2004, Dr. Boyer performed the discectomy and fusion surgery. (Tr. 101-06). In October, 2004, Plaintiff saw Dr. Boyer for post surgical follow-up. She did not get her routine postoperative x-rays taken. Plaintiff believes her symptoms are not much improved and are very similar to her pre-operative status. (Tr. 151).

A October, 2004, cervical spine x-ray revealed mild thoracic scoliosis and status post anterior fusion C5, 6 and 7 without evidence of loosening. (Tr. 153, 160). A November, 2004, lumbar spine MRI showed degenerative changes but was otherwise negative. (Tr. 152, 241).

In October, 2004 and June, 2005, state agency reviewing physicians, concluded that Plaintiff could lift 20 pounds occasionally and ten pounds frequently; and sit, stand, and walk for six hours each in an eight-hour workday. Plaintiff had decreased lumbar range of motion, but no muscle atrophy. She could not crouch, crawl, or climb ladders, ropes, or scaffolds. (Tr. 206-13).

In November, 2004, Robert E. Sexton, Ph.D., a consulting psychologist, evaluated Plaintiff who claimed physical and mental problems prevented her from working. She completed the 9th grade in a regular classroom and she left school because she got married. She did later complete requirements for her GED. Dr. Sexton estimated Plaintiff's intelligence to be in the low average range. He diagnosed dysthymic and somatoform disorder; he assigned a Global Assessment of Functioning (GAF) score of 55-61[1]. Dr. Sexton opined that Plaintiff was capable of performing simple, repetitive tasks. She had fair ability to interact with others and tolerate

---

[1]     "GAF," Global Assessment Functioning, is a tool used by health-care professionals to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness. It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation. *See Martin v. Commissioner*, 61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision ("DSM-IV-TR") at 32-34.

work stresses. (Tr. 107- 111).

Dr. Boyer saw Plaintiff for follow-up of her neck and right shoulder pain in November, 2004. She showed no improvement in the neck symptoms. (Tr. 148-49).

Bonnie L. Katz, Ph.D., a psychologist for the state agency, reviewed the medical record in November, 2004, and concluded that Plaintiff did not have a severe mental impairment. (Tr. 112-25).

Plaintiff was admitted to the hospital in December 2004, with complaints of shortness of breath for the past two weeks, chest pain, associated with intense urge to have diarrhea, and panic attack at home. Diagnostic testing, including chest x-ray and exercise stress test, were essentially normal. Examination of Plaintiff's neck revealed negative tenderness, negative stiffness and full range of motion. Plaintiff was discharged home with an increased dose of Celexa and Xanax for anxiety. (Tr. 127-38).

Plaintiff presented to the ER a second time in December 2004, complaining of burning in her chest. The physician wanted to admit her for chest pain to rule out any cardiac causes for her pain and because she is a smoker. Plaintiff refused admission and signed out against medical advice. (Tr. 139-141).

In January, 2005, Plaintiff was seen consultatively by James S. Powell, M.D. He noted that following her cervical spine surgery, Plaintiff reported no change in her neck symptoms. Plaintiff demonstrated marked spinal muscle spasms, with decreased range of motion. Plaintiff had no strength deficits and normal reflexes in her arms. Dr. Powell noted that x-rays revealed failed fusion "due to the patient's noncompliance". He recommended that Plaintiff utilize a bone stimulator, stop smoking, and avoid anti-inflammatory medication. Dr. Powell concluded that

8

Plaintiff has a potential for returning to work, despite the undergoing myelopathy. He noted that if the fusion takes, maximum medical improvement could be expected after physical therapy in as short as three months. The need for a re-fusion is also a possibility. Plaintiff could return to work in as few as three months. (Tr. 142-43).

In February, 2005, Dr. Boyer recommended a bone stimulator in light of Plaintiff's continued smoking. Dr. Boyer also reported that Plaintiff could begin physical therapy. (Tr. 145-46).

In March, 2005, Gail Feinberg. D.O. completed a basic medical form and described Plaintiff's medical condition as generalized anxiety disorder. Plaintiff reported 3 panic attacks per week. Treatment included counseling and "psych" referral. Dr. Feinberg claimed that Plaintiff was unemployable until "followed by psych." (Tr. 173-74). Dr. Feinberg also completed an assessment as to Plaintiff's mental functioning. Dr. Feinberg diagnosed Plaintiff with generalized anxiety disorder and prescribed Klonopin and Lexapro after Plaintiff reported having three panic attacks a week. When asked to describe the "clinical findings including results of mental status examination which demonstrate the severity of your patient's mental impairment and symptoms," Dr. Feinberg wrote "none apparent". Dr. Feinberg wrote that Plaintiff's symptoms improved with medication and her prognosis was good. Dr. Feinberg rated Plaintiff as good in only four areas, and fair or having poor or no abilities for unskilled work in all other areas. She also described a degree of functional limitation indicating only moderate limitation in daily activities, social functioning, and concentration, persistence, and pace, but repeated episodes of deterioration or decompensation. (Tr. 177-84).

In March, 2005, a physical therapist noted that despite limited range of motion,

9

Plaintiff's reflexes were symmetric and brisk; she had received 12 therapy sessions, and had a ten pound lifting restriction. (Tr. 175).

In May, 2005, James J. Rosenthal, Psy.D., performed a consultative psychological evaluation. Plaintiff reported that she repeated the third grade but was in regular classes. She reported that she lives by herself, pays her bills, watches television, goes to the doctor as scheduled, visits with her children and grandchildren regularly, sits on the porch during the day, reads some days, cooks and does word puzzle books. She reported that she had back pain since 2003, but "she doesn't focus much on the pain because she has become somewhat used to it". Plaintiff claimed to have panic attacks of five to ten minutes duration, about every week for four months. Based on a consideration of Plaintiff's reported panic attacks and activities, Dr. Rosenthal assigned Plaintiff a GAF score at 61. She had no problem understanding, remembering, or following simple, one and two step job instructions; fair ability to relate to others; mildly to moderately limited ability to tolerate stress; and mildly impaired ability to sustain attention and concentration. (Tr. 185-88).

In June, 2005, Robelyn S. Marlow, Ph.D., a state agency reviewing psychologist, indicated Plaintiff generally had moderate limitation, with no episodes of decompensation. Plaintiff was able to understand, remember, and carry out simple and somewhat complex tasks; make simple decisions; relate to co-workers and supervisors superficially and occasionally, but would have difficulty dealing with the public; and could deal with occasional changes in routine. (Tr. 189-205).

In August, 2005, Eric Johnson, Ph.D., a psychologist, examined Plaintiff in connection with her pending worker's compensation claim. Plaintiff reported having panic attacks when

10

around a large group of people, since the previous fall or winter. She claimed two panic attacks each week. Plaintiff claimed she avoided people; she did "a lot of crossword puzzles" but did not read much. Testing revealed a verbal I.Q. of 75, a performance I.Q. of 65, and a full scale I.Q. of 68, suggesting Plaintiff functioned between the low borderline to mildly mentally retarded range, but Dr. Johnson suspected this was "probably a low estimate". Dr. Johnson assessed that Plaintiff would work best in setting with not much contact with other people, though she was "fairly emotionally stable and socially predictable". Plaintiff was able to understand and carry out simple instructions; and she had impaired delayed recall and some problems concentrating on a consistent basis; she could deal adequately with others at work on a one-on one basis. Dr. Johnson also noted that Plaintiff's psychiatric symptoms were due to pain and restriction of activities related to her work injury; she reported no symptoms prior to then. (Tr. 214-220).

A June, 2006, lumbar spine MRI showed a dural lesion. (Tr. 280).

In September, 2006, Plaintiff saw Stephen Nutter, M.D. for an orthopedic evaluation. Dr. Nutter noted that the lumbar MRI from May 2004 showed no bulging or herniation. Examination revealed Plaintiff had a normal gait and appeared stable and comfortable. Dr. Nutter reported Plaintiff's intellectual functioning seemed "normal throughout examination". Her recent and remote memory for medical events was good. Based on a relatively normal physical examination, Dr. Nutter diagnosed chronic cervical, thoracic, and lumbar strain with no evidence of radiculopathy, and degenerative arthritis. Though Plaintiff had some range of motion abnormalities, she had negative straight leg raising, no sensory abnormality, and normal reflexes. It was unclear whether there was any true weakness or muscle spasm. Dr. Nutter was unable to assess lifting capability due to Plaintiff's submaximal voluntary effort. Dr. Nutter

11

concluded Plaintiff could sit for four hours and for two hours at one time, and stand for four

hours and for one-to-two hours at one time. (Tr. 291- 300).

## OPINION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ concluded that Plaintiff has severe impairments of "degenerative disc pathology

(status post cervical fusion at C5-7); diminished visual acuity without bifocals; smoker's

shortness of breath; borderline intellectual functioning; anxiety disorder (NOS)/panic disorder;

and pain disorder. Additional impairments, which include gastrointestinal and female bladder

complaints as well as diminished hearing complaints have been considered and found to be less

than severe." (Tr. 17; Finding 3). The ALJ found that no impairment nor combination of

impairments met any Listing. The ALJ concluded that:

> After careful consideration of the entire record, the undersigned
> finds that the claimant has the residual functional capacity to
> lift/carry 20 pounds occasionally (1/3 of a workday) and 10 pounds
> frequently (2/3 of a workday); stand/be on feet at least four hours
> total, one hour at a time; no prolonged walking; sit at least six to
> eight hours total, two hours at a time; occasionally push/pull with
> upper and lower extremities, maximum 20 pounds torque; no
> sustained/frequent overhead work; no job requiring the use of
> handheld vibrating-type power tools; no climbing hills/slopes or
> work on uneven terrain; no climbing high ladders or work at
> unprotected heights; only occasionally climb stairs/steps/ramps,
> bend/stoop, balance, crouch or kneel; never squat or crawl for
> prolonged periods; no work in the vicinity of heavy moving
> machinery or otherwise exposure to excessive floor vibrations; no
> operation of mobile equipment or otherwise exposed to
> jarring/jostling/jolting; no commercial vehicle driving; never
> operate foot (pedal) controlled equipment; no exposure to
> excessive air pollutants, pulmonary irritants or allergens; no
> exposure to temperature extremes (cold); and no work in
> damp/humid conditions. She should be permitted to wear
> corrective eyeglasses as desired and wear ear protective devices or

12

> hearing aids as appropriate. The claimant is functioning within the
> borderline range of intelligence. Secondary to her mental
> impairments, she bas no problem understanding, remembering or
> following simple one or two (sic) job instructions; she has a fair
> ability to relate to bosses, co-workers, and the general public; she
> has a mildly to moderately impaired ability to tolerate the stress of
> day-to-day employment due to her anxiety; and she is mildly
> impaired in her ability to sustain attention and concentration to
> complete daily work tasks (Exhibit 13F).

(Tr. 20; Finding 5). The ALJ then found that Plaintiff is unable to perform her past relevant

work as a housekeeper, fast food worker, warehouse worker and cashier. Tr. 22 (finding 6).

Relying on the VE testimony, the ALJ further found that Plaintiff can perform a number of jobs

which exist in representative numbers in the national economy. *Id.* (finding 10). Therefore, the

ALJ found that Plaintiff was not disabled and unable to receive Social Security benefits. Tr. 24

(finding 11).

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).

The Court's sole function is to determine whether the record as a whole contains substantial

evidence to support the Commissioner's decision. The Commissioner's findings stand if they are

supported by "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales,* 402 U.S. 389,401 (1971) (citing *Consolidated Edison Co.* v.

*N.L.R.B.,* 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are

supported by substantial evidence, the Court must consider the record as a whole. *Hephner* v.

13

*Mathews,* 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(1),423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(I)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix I. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden

14

of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley* v. *Secretary of H.H.S.,* 708 F.2d 1048 (6th Cir. *1983); Kirk* v. *Secretary of H.H.S.,* 667 F.2d 524 (6th Cir. 1981), *cert. denied, 461* U.S. 957 (1983).

A severe impairment or combination of impairments is one which significantly limits the physical or mental ability to perform basic work activities. 20 C.F.R. §404.1520 ( C). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting. 20 C.F.R. §404.1521(b). Plaintiff is not required to establish total disability at this level of the evaluation. Rather, the severe impairment requirement is a threshold element which plaintiff must prove in order to establish disability within the meaning of the Act. *Gist v. Secretary of H.H.S.,* 736 F.2d 352, 357 (6th Cir.1984). The severity requirement may be employed as an administrative convenience to screen out claims that are totally groundless solely from a medical standpoint. *Higgs v. Bowen,* No. 876189, slip op. at 4 (6th Cir. Oct. 28, 1988). An impairment will be considered non severe only if it is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v. Secretary of H.H.S.,*773 F.2d 85, 90 (6th Cir. 1985)(citing *Brady v. Heckler,* 724 F.2d 914, 920 (11th Cir. 1984)). The Secretary's decision on this issue must be supported by substantial evidence. *Mowery v. Heckler,* 771 F.2d 966 (6th Cir. 1985).

Plaintiff has the burden of establishing disability by a preponderance of the evidence.

15

*Born* v. *Secretary of Health and Human Servs.,* 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch* v. *Richardson,* 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon* v. *Apfel,* 168 F.3d 289, 291 (6th Cir. 1999); *Born,* 923 F.2d at 1173; *Allen v. Califano,* 613 F.2d 139 (6th Cir. 1980). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiffs individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.,* 587 F.2d 321, 323 (6th Cir. 1978). *See also Richardson* v. *Secretary of Health & Human Services,* 735 F.2d 962,964 (6th Cir, 1984)(per curiam). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *O'Banner,* 587 F.2d at 323. *See also Cole* v. *Secretary of Health and Human Services,* 820 F.2d 768, 771 (6th Cir. 1987).

When the grid is not applicable, the Commissioner must make more than a generalized finding that work is available in the national economy; there must be "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform *specific* jobs." *Richardson* v. *Secretary of H.H.S., 735* F.2d 962, 964 (6th Cir. 1984) (per curiam) (emphasis in original); *O'Banner* v. *Secretary of H.E.W.,* 587 F.2d 321, 323 (6th Cir. 1978). Taking notice of job availability and requirements is disfavored. *Kirk* v. *Secretary of H.H.S.,* 667 F.2d 524,536-37 n.7, 540 n.9 (6th Cir. 1981), *cert. denied,* 461 U.S. 957 (1983). There must be more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national

16

economy. *Richardson,* 735 F.2d at 964; *Kirk,* 667 F.2d at 536-37 n.7. The Commissioner is not permitted to equate the existence of certain work with plaintiff's capacity for such work on the basis of the Commissioner's own opinion. This crucial gap is bridged only through specific proof of plaintiff's individual capacity, as well as proof of the requirements of the relevant jobs. *Phillips* v. *Harris,* 488 F. Supp. 1161 (W.D. Va. 1980)(citing *Tayor v. Weinberger,* 512 F.2d 664 (4th Cir. 1975)). When the grid is inapplicable, the testimony of a vocational expert is required to show the availability of jobs that plaintiff can perform. *Born v. Secretary of H.H.S.,* 923 F.2d 1168, 1174 (6th Cir, *1990); Varley* v. *Secretary of H.H.S.,* 820 F.2d 777, 779 (6th Cir. 1987).

The assumptions contained in an ALJ's hypothetical question to a vocational expert must be supported by some evidence in the record. *Hardaway* v. *Secretary of H.H.S.,* 823 F.2d 922, 927-28 (6th Cir. 1987). A proper hypothetical question should accurately describe plaintiff in all significant, relevant respects; for a response to a hypothetical question to constitute substantial evidence, each element of the hypothetical must accurately describe the claimant." *Felisky* v. *Bowen,* 35 F.3d 1027, 1036 (6th Cir. 1994). *See also Varley* v. *Secretary of H.H.S.,* 820 F.2d 777, 779 (6th Cir. 1987). Where the evidence supports plaintiffs allegations of pain, a response to a hypothetical question that omits any consideration of plaintiffs pain and its effects is of "little if any evidentiary value." *Nos* v. *Weinberger,* 512 F.2d 588, 596 (6th Cir. 1975). However, "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of H.H.S.,* 39 F.3d 115, 118 (6th Cir. 1994).

A mental impairment may constitute a disability within the meaning of the Act. *See* 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). However, the mere presence of a mental impairment does not establish entitlement to disability benefits. In order for a claimant to recover benefits,

17

the alleged mental impairment must be established by medical evidence consisting of clinical signs, symptoms and/or laboratory findings or psychological test findings. 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.00(B); *Moon* v. *Sullivan,* 923 F.2d 1175, 1182 (6th Cir. 1990).

Alleged mental impairments are evaluated under the same sequential analysis as physical impairments. Once the Commissioner determines that a mental impairment exists, he/she must then evaluate the degree of functional loss it causes according to a special procedure. 20 C.F.R. §§ 404.1520a. A standard document, called the Psychiatric Review Technique Form, must be completed at each level of administrative review. This form, which corresponds to the Listing of Impairments for mental impairments, lists the signs, symptoms, and other medical findings which establishes the existence of a mental impairment.

The special procedure then requires a rating of the degree of functional loss resulting from the impairment. 20 C.F.R. § 404.1520a(b)(2). Plaintiffs level of functional limitation is rated in four areas: 1) activities of daily living; 2) social functioning; 3) concentration, persistence, and pace; and 4) deterioration or decompensation in work or work-like settings. 20 C.F.R. § 404.1 520a(c)(3); *see Hogg* v. *Sullivan,* 987 F.2d 328,332 (6th Cir. 1993)(per curiam). The first three areas are rated on the following five-point scale: none, mild, moderate, marked, and extreme. The fourth is rated on the following four-point scale: none, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity. 20 C.F.R. § 404.1520a(c)(4).

Where the mental impairment is found to be severe, a determination must then be made as to whether it meets or equals a listed mental disorder. If it does not, the Commissioner must then complete a Mental Residual Functional Capacity Assessment form. This form also seeks to

18

evaluate functional loss; however, it is intended to provide a more detailed analysis than that provided by the Psychiatric Review Technique form. The Commissioner must determine if this mental residual functional capacity is compatible with the performance of the individual's past relevant work, and if not, whether other jobs exist in significant numbers in the economy that are compatible with this assessment. *See* 20 C.F.R. § 404.1520©-(f).

The regulations expressly provide that the responsibility for deciding a claimant's residual functional capacity rests with the Administrative Law Judge when cases are decided at an administrative hearing. *Webb v. Commissioner of Social Security,* 368 F.3d 629, 633 (6th Cir. 2004)(citations omitted). [20 C.F.R. § 404.1546; § 404.1527(e)(2)].

Pain alone, if the result of a medical impairment, may be severe enough to constitute disability. *Kirk* v. *Secretary of H.H.S.* 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied,* 461 U.S. 957 (1983). In order to find plaintiff disabled on the basis of pain alone, the Commissioner must first determine whether there is objective medical evidence of an underlying medical condition. If there is, the Commissioner must then determine: (1) whether the objective medical evidence confirms the severity of pain alleged by plaintiff; or (2) whether the underlying medical impairment is severe enough that it can reasonably be expected to produce the allegedly disabling pain. *Duncan* v. *Secretary of H.H.S.,* 801 F.2d 847, 852-53 (6th Cir. 1986). *See also Felisky* v. *Bowen,* 35 F.3d 1027, 1038-39 (6th Cir. 1994); *Jones* v. *Secretary of H.H.S.,* 945 F.2d 1365, 1369 (6th Cir. 1991). This test, however, "does not require ... 'objective evidence of the pain itself.'" *Duncan,* 801 F.2d at 853. Where a complaint of pain is not fully supported by objective medical findings, the Commissioner should consider the frequency and duration of pain, as well as other precipitating factors including the effect of the pain upon plaintiff's activities, the effect

19

of plaintiff's medications and other treatments for pain, and the recorded observations of pain by plaintiff's physicians. *Felisky,* 35 F.3d at 1039-40.

Where the medical evidence is consistent, and supports plaintiff's complaints of the existence and severity of pain, the ALJ may not discredit plaintiff's testimony and deny benefits. *King* v. *Heckler,* 742 F.2d 968, 975 (6th Cir. 1984). Where, however, the medical evidence conflicts, and there is substantial evidence supporting and opposing a finding of disability, the Commissioner's resolution of the conflict will not be disturbed by the Court. *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983) (per curiam). In either event, the ALJ must articulate, on the record, his evaluation of the evidence and how it relates to the factors listed above. *Felisky,* 35 F.3d at 1039-41.

In light of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly. *Kirk,* 667 F.2d at 538. "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky, 35* F.3d at 1036. The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst* v. *Sec. of H.H.S.,* 753 F.2d 517, 519 (6th Cir. 1985)(citing *Zblewski v. Schweiker,* 732 F.2d 75, 78 (7th Cir. 1984)).

## OPINION

Plaintiff argues that the ALJ's RFC finding is erroneous; specifically, that the standing and sitting limitations are not supported by the medical evidence upon which the ALJ purports to rely. Plaintiff argues there is a material difference between the opinion of Dr. Nutter, to which

20

treating physician, plaintiff has failed to point any evidence from any treating source which contradicts the standing and sitting limitations set forth by the ALJ. Indeed, in March 2005, Dr. Feinberg, plaintiff's treating physician, examined plaintiff for generalized anxiety disorder, and noted that plaintiff's ability to sit, stand, and or lift was not affected. (Tr. 174).

In his hypothetical question to the VE, the ALJ described a female claimant limited to sitting and standing as follows: "that she can be on her feet at least half the workday, so that's at least four hours minimum, and no more than one hour at a time, that she can sit at least six hours or two thirds (sic) of the workday, to about eight hours total, no more than two hours at a time." (Tr. 329). The ability to alternate between sitting and standing is clearly subsumed in the hypothetical question. In response, the VE testified that an individual with those limitations could perform 20,000 light, and 15,000 sedentary jobs. (Tr. 332). The Commissioner properly relied on the VE's testimony in concluding that there are a significant number of jobs in the economy that Plaintiff is capable of performing because the hypothetical question presented to the VE had support in the record and accurately portrayed Plaintiff's impairments which the ALJ found credible. *Blacha v. Secretary of Health and Human Services*, 927 F.2d 228, 231 (6th Cir. 1990); *see also, Stanley v. Secretary of Health and Human Services,* 39 F.3d 115, 118 (6th Cir. 1994); *Casey v. Secretary of Health and Human Services,* 987 F.2d 1230, 1235 (6th Cir. 1993).

Plaintiff argues in support of her next error that the ALJ should have found at least a closed period of disability. Plaintiff argues her neck impairment lasted well over 12 consecutive months, pursuant to the definition of disability under 20 C.F.R. § 404.1505. Plaintiff further contends that if even if the fusion surgery done in August, 2004 had been successful, the recovery period from this would have extended after October, 2004, 12 months from the

22

onset date of disability. No physician gave an opinion that Plaintiff was disabled due to her neck impairment. Plaintiff relies on the opinion of Dr. Boyer. The Plaintiff improperly relies on Dr. Boyer's treatment note of December 4, 2003. (Tr. 164-65). During this visit, Plaintiff states her pain started 2 months prior and he does note that if Plaintiff undergoes surgery, her recovery period would be at least 90 days from surgery before she could return to work. This does not equate to 12 consecutive months. Also during this visit, Plaintiff's physical examination was essentially normal. *Id.*

Plaintiff also relies on the opinion of Dr. Powell who reported that if the fusion takes, maximum medical improvement could be expected after physical therapy in as short as three months and that Plaintiff might then return to work in as few as three months. (Tr. 143). Dr. Powell also reported Plaintiff had no strength deficits and normal reflexes in her arms. To the extent her spinal fusion failed, it was "due to the patient's noncompliance" *Id.*

Again, the ALJ gave "great weight" to the opinions of Drs. Frehofner and Panglangan, Dr. Rosenthal, and Dr. Nutter. (Tr. 22). The ALJ further noted Plaintiff's activities of daily living reported to the consultative examiners was inconsistent with her extreme pain symptoms described at the hearing. *Id.* The ALJ properly evaluated the medical source opinions to determine that Plaintiff was not disabled based on her neck impairment, and therefore not entitled to a closed period of disability.

In Plaintiff's next stated error, she contends the ALJ erred by not finding her panic disorder would cause her to miss work. A severe impairment is one which significantly limits the physical or mental ability to perform basic work activities. *See,* 20 C.F.R. §§404.1521, 416.921. An impairment can be considered as not severe, and the application rejected at the

23

second stage of the sequential evaluation process, only if the impairment is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience. *Farris v. Secretary of Health and Human Services,* 773 F.2d 85, 90 (6th Cir. 1985)(citation omitted).

An administrative law judge does not commit reversible error in finding a non-severe impairment where the ALJ considers all impairments, including non-severe impairments, in determining residual functional capacity. *See Maziarz v. Secretary of Health and Human Services,* 837 F.2d 240, 244 (6th Cir. 1987).

In the present case, Plaintiff refers to her subjective complaints as set forth in the record, but fails to argue how the ALJ erred in his evaluation of her alleged mental residual functional capacity. As the Commissioner contends, Dr. Feinberg is the only physician to note panic attacks in any treatment notes, but her opinion was also based on Plaintiff's subjective complaints and not based on any clinical findings or psychological evaluation. The Plaintiff claimed to have three or four attacks per week in March 2005, she didn't seek treatment for them; instead, she admitted that they were "good/stable with treatment." (Tr. 173). Examining psychologist, Dr. Rosenthal, noted a diagnosis of panic disorder and agoraphobia, based on plaintiff's reports. (Tr. 187). Dr. Rosenthal reported Plaintiff had a fair ability to relate to others and deal with stress, and assigned a GAF score of 61.

As noted above, reviewing psychologists, Dr. Marlow indicated Plaintiff generally had moderate limitations, with no episodes of decompensation. Dr. Marlow reported Plaintiff was able to understand, remember, and carry out simple and somewhat complex tasks; make simple decisions; relate to co-workers and supervisors superficially and occasionally, but would have

24

difficulty dealing with the public; and could deal with occasional changes in routine (Tr. 189-205). The Court concludes the ALJ properly provided for any limitations Plaintiff had due to her panic disorder in determining her mental RFC.

Plaintiff next argues that the ALJ erred because he did not evaluate Plaintiff under Listing 12.05C. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. Plaintiff contends she meets Listing 12.05C due to her I.Q. scores of 65 and 68. (Tr. 217). Plaintiff further argues that Dr. Johnson, the psychologist doing the testing, noted mild mental retardation. She also contends she meets the Listing based on having repeated the third grade in school and taking four attempts to pass the written portion of her driver's license exam. Plaintiff argues that the above deficits show evidence sufficient to support a finding of deficits in adaptive functioning before age 22.

Listing 12.05 provides in pertinent part:

Mental Retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning[2] initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

*
*
*

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

---

[2] Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." Diagnostic and Statistical Manual of Mental Disorders, 4th Ed., (DSM IV)(2000) at page 42. Mental retardation requires concurrent deficits or impairments in present adaptive functioning in lit least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. *Id.* at 49.

A plaintiff must demonstrate that his impairment satisfies the diagnostic description for the listed impairment in order to be found disabled thereunder. *Foster v. Halter,* 279 F.3d 348 (6th Cir. 2001). In other words, not only must plaintiff have a documented I.Q. score of Listing level severity, but plaintiff must also provide evidence showing he meets the diagnostic description of mental retardation in the introductory paragraph of Listing 12.05. As recognized by the *Foster* Court, "recent amendments to the regulations further clarify that a claimant will meet the listing for mental retardation only '[i]f [the claimant's] impairment satisfies the diagnostic description in the introductory paragraph *and* anyone of the four sets of criteria... .' 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A) as amended by 65 Fed. Reg. 50746,50776 (August 21,2000)." *Foster,* 279 F.3d at 354 (emphasis in the original). Thus, for purposes of Listing 12.05C, plaintiff must show (1) she suffers from "significantly subaverage general intellectual functioning," (2) she suffers from "deficits in adaptive functioning," (3) such deficits initially manifested during the developmental period (i.e., before age 22), and (4) a valid I.Q. score between 60 through 70 *and* an additional physical or other mental impairment imposing an additional and significant work-related limitation of function. *See Foster,* 279 F.3d at 354-55. *See* also *Daniels v. Commissioner,* 70 Fed. Appx. 868, 872 (6th Cir. 2003), 2003 W.L. 21774004.

To the extent plaintiff contends the ALJ erred by failing to find her conditions were equivalent in severity to Listing 12.05C, plaintiff bears the burden of presenting "medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Foster,* 279 F.3d at 355, quoting *Sullivan* v. *Zebley,* 493 U.S. 521, 531 (1990)(emphasis in the original). Social Security regulations further provide that medical equivalence "must be supported by

medically acceptable clinical and laboratory diagnostic techniques:' 20 C.F.R. § 416.926(b).

In the instant case, plaintiff fails to present evidence that she meets or equals all the requirements of Listing 12.05C. As indicated above, plaintiff must present evidence showing she meets or equals the diagnostic description in the introductory paragraph of Listing 12.05, *i.e.,* that she suffers from mental retardation: "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period." Plaintiff fails to present *any* evidence that she meets the diagnostic description for mental retardation or to articulate what medical findings are equivalent in severity to the diagnostic description for mental retardation. No medical source in the record has diagnosed plaintiff with mental retardation. There is no indication in the record that plaintiff exhibited deficits in adaptive functioning manifested before age 22.

In fact, as the Commissioner argues, Dr. Johnson noted that IQ scores were suggestive of mild mental retardation, he suspected that this was "probably a low estimate". (Tr. 217). Moreover, in the diagnosis portion of his report, he indicated the need to rule out borderline intellectual functioning. (Tr. 217). In the medical report, Dr. Johnson indicated that Plaintiff's diagnosis was rule out borderline intellectual functioning, not mental retardation. (Tr. 220).

In addition, non-medical record evidence demonstrates plaintiff's impairment did not result in deficits in adaptive functioning as required for a diagnosis of mental retardation. Plaintiff testified that she drove, just not long distances. She occasionally did word search books. In August 2005, Plaintiff reported that she shared the household chores with her fiance. She did the dishes, laundry, made the bed and swept the floor. She liked to work with her flowers and tried to stay as active as she can to ward off the panic attacks. She visited with her father, did

27

crossword puzzles, and took care of her personal needs. (Tr. 215). In May 2005, Plaintiff reported that she lived by herself, paid her bills, watched television, went to the doctor as scheduled, visited with her children and grandchildren regularly, read, cooked and did word puzzle books. (Tr. 186).

Since medical equivalence "must be supported by medically acceptable clinical and laboratory diagnostic techniques," 20 C.F.R. § 416.926(b), and plaintiff has failed to identify any medical opinion showing her impairment equaled Listing 12.05C, plaintiff has failed to carry her burden of showing equivalence to Listing 12.05C.

Plaintiff asserts in her remaining error that the ALJ's credibility findings are not supported by the record. Contrary to Plaintiff's contentions, substantial evidence supports the ALJ's credibility determination.

The ALJ supports his conclusion with two pages of examples of inconsistency in plaintiff's testimony and additional evidence. (Tr. 21-22). As the Commissioner noted, Plaintiff testified that she took only over-the-counter medication for pain. (Tr. 21, 321). Though Plaintiff claimed other medication brought on panic attacks, no record evidence supports that claim. To the contrary, doctors indicated Plaintiff had a good response to medication, (Tr. 204), including Dr. Feinberg, who noted Plaintiff had a good response to medication for her mental problems. (Tr. 179). No evidence supports Plaintiff's claim that she had significant side effects from medication. In November 2004, two months after her back surgery, Plaintiff reported that she "is able to do some cooking, cleaning, laundry, and grocery shopping as well". (Tr. 109). Given this substantial evidence, the ALJ's credibility determination may not be overturned. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). ("ALJ's findings based on the credibility

28

of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."). The ALJ found some of Plaintiff's subjective allegations to be credible, and the credible portions are reflected in the residual functional capacity.

## CONCLUSION

The Court's duty on appeal is not to re-weigh the evidence, but to determine whether the decision below is supported by substantial evidence. *See, Raisor v. Schweiker,* 540 F.Supp. 686 (S.D.Ohio 1982). The evidence "must do more than create a suspicion of the existence of the fact to be established. ... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *LeMaster v. Secretary of Health and Human Services,* 802 F.2d 839, 840 (6th Cir. 1986), *quoting, NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300 (1939). The Commissioner's decision in this case is supported by such evidence.

Because substantial evidence supports the decision of the ALJ, the Court recommends that his decision be **AFFIRMED** and that this case be **DISMISSED** from the docket of the Court.

February 5, 2009

Timothy S. Hogan
United States Magistrate Judge

29

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS REPORT & RECOMMENDATION

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), ( C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

30